UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ADAM SCHUT ET AL., )<br>    PLAINTIFFS/COUNTER- )<br>    DEFENDANTS, )<br>)<br>-V- )<br>)<br>STAFFORD-SMITH, INC. ET AL., )<br>    DEFENDANTS/COUNTER- )<br>    PLAINTIFFS. )<br>_____ ) | NO. 1:12-CV-787<br><br>HONORABLE PAUL L. MALONEY |

## OPINION

This matter came before the Court for a bench trial on February 4, 2014. (ECF No. 95.) Since much of the case had been pared down prior to the bench trial (*see, e.g.*, ECF Nos. 63, 65), the sole remaining triable issue was Stafford-Smith's conversion claim against Adam Schut.

**I. FINDINGS OF FACT**

1. Adam Schut was hired by Stafford-Smith in 2000 as a Project Manager and promoted in 2004 to a position of Regional Manager of Stafford-Smith's office in Indianapolis, Indiana.

2. As Regional Manager, Schut negotiated with commercial kitchen equipment vendors on behalf of Stafford-Smith.

3. A "spiff" is money or another inducement offered to a retailer's salesperson by a manufacturer or its representative in order to encourage the salesperson to recommend the manufacturers' products to potential buyers.

4. Spiffs are common in the food service equipment industry.

5. From September 2011 through July 2012, Schut received $6,269.57 in payments from commercial kitchen equipment vendor marketing representatives.

1

6. Schut received $4,194.70 in or around January 2012 from 2 Market Group that was not authorized by Stafford-Smith.

7. That amount represented 5% of the purchase price of a piece of equipment that Stafford-Smith purchased.

8. While not an "ordinary" spiff, the payment was not a rebate owed or payable to Stafford-Smith, and Stafford-Smith was not the intended beneficiary of the payment.

9. Schut received several other "ordinary" spiffs in whole-dollar amounts, or "per piece" incentives, that were not clearly prohibited by Stafford-Smith's policies and practices.

10. All spiffs were given to Schut in the form of checks made payable Schut.

11. Stafford-Smith had no particular expectation to receive any of the spiffs, nor a contractual basis for demanding the receipt of the spiffs.

12. The payments were, in fact, paid directly to Schut, and not to Stafford-Smith.

13. Schut deposited the payments into his personal PNC bank account.

14. Schut also deposited funds from other sources into the PNC bank account.

15. During Schut's employment, spiffs were given to other Stafford-Smith employees.

## II. LEGAL FRAMEWORK

The parties agree that the sole remaining triable issue is a claim for conversion under Indiana law. At the close of trial, the Court determined that all but one of the spiffs paid to Schut were not property of Stafford-Smith.[1] The sole remaining spiff at issue in this case is a spiff in the amount of $4,194.70 paid to Schut by 2 Market Group in or around January 2012 for the sale of a Thermalrite walk-in cooler. That amount represented 5% of the purchase price of a piece of equipment that Stafford-Smith purchased.

---

[1] Respectfully, the issue of whether the other "ordinary" spiffs were property of Stafford-Smith was not even a close call under Indiana law.

2

The Court ordered the parties to submit supplemental briefs on the issue of whether the Thermalrite Spiff is property of Stafford-Smith convertible by Schut under Indiana law.

The statute defining conversion under Indiana law states: "A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A Misdemeanor." Ind. Code § 35-43-4-3(a).

However, while "[c]riminal conversion requires the unauthorized control to be either knowing or intentional[,] . . . [m]ens rea . . . is not an element of tortious conversion." *Computers Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995) (citing *Coffel v. Perry*, 452 N.E.2d 1066, 1069 (Ind. 1983)). In other words, "[g]ood faith is no defense." *Id.* (citing *Indiana & Mich. Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588, 610 (Ind. 1987)).

Accordingly, a plaintiff can establish the tort of conversion, or civil theft, by proving the defendant (1) appropriated the plaintiff's personal property for the defendant's own use and benefit, (2) appropriated and then destroyed the plaintiff's personal property, (3) exercised dominion over the plaintiff's personal property, in exclusion and defiance of the rights of the owner or lawful possessor, or (4) withheld the plaintiff's property from plaintiff's possession, under a claim and title inconsistent with the plaintiff's claim and title. *See, e.g., id.* (citing *Shank Fireproof Warehouse Co. v. Harlan*, 29 N.E.2d 1003, 1005 (Ind. Ct. App. 1940) (en banc)); *Kappel v. Kappel*, 979 N.E.2d 642, 652 (Ind. Ct. App. 2012); *Estate of Schrenker v. State*, 919 N.E.2d 1188, 1194 (Ind. Ct. App. 2010).

If Stafford-Smith established the conduct here constituted criminal conversion, it would be entitled to treble damages plus the costs of the action and attorney fees. If Stafford-Smith only failed to establish the conduct was "knowing or intentional," it would be entitled to recover its actual damages for civil conversion.

**III.   ANALYSIS**

Ultimately, the Court finds that Stafford-Smith has failed to establish that the remaining payment at issue in this case were its "personal property" necessary to support a conversion claim.

Under Indiana law, "money may be the subject of an action for conversion[,]" but "the money must be capable of being identified as a special chattel." *Kopis v. Savage*, 489 N.E.2d 1266, 1270 (Ind. Ct. App. 1986) (citations omitted); *see, e.g., Stevens v. Butler*, 639 N.E.2d 662, 666 (Ind. Ct. App. 1994).

For money to be the subject of an action for conversion, the money "must be a determinate sum with which the defendant was entrusted to apply to a specific purpose." *Kopis*, 489 N.E.2d at 1270 (citing *Bunger v. Roddy*, 70 Ind. 26 (Ind. 1880) and *Rauh v. Stevens*, 52 N.E.2d 997 (Ind. Ct. App. 1899)); *see, e.g., Bowden v. Agnew*, 2 N.E.3d 743, 750 (Ind. Ct. App. 2014) ("Our cases make clear, however, that money may be the subject for an action for conversion only if it is capable of being identified as a special chattel."); *see also Tobin v. Ruman*, 819 N.E.2d 78, 89 (Ind. Ct. App. 2005) (quoting *Huff*, 654 N.E.2d at 836).

In fact, in *Kopis*, a seller received a $40,000 deposit toward the purchase of property. 489 N.E.2d at 1269. The seller deposited the amount in other unrelated accounts and refused to refund the money when the deal collapsed. *Id*. In reversing the trial court's conclusion that this constituted conversion, the Court of Appeals noted:

> We are unable to find anything in the agreement which suggests [Seller] was under any obligation to return *the specific* $40,000 which [Buyer] had given him. The parties did not agree to set up an escrow account or deliver the money to any third party for safekeeping. We can find nothing in the conduct of the parties or in the wording of the receipt which indicates that the parties intended for [Buyer] to retain ownership or possessory rights in the $40,000.

*Id.* at 1270 (emphasis in original).

That is not to say that the Court found nothing wrong—"Kopis did incur an obligation to repay the debt which resulted when Savage was unable to procure financing for the sale[, and] there is certainly no evidence that Savage intended to make a gift of the money to Kopis." *Id.* at 1271.[2] However, the Court of Appeals simply and appropriately noted that the trial "court made an erroneous conclusion therefrom that a conversion occurred." *Id.*

Here, Stafford-Smith chiefly cites to *Midland-Guardian Co. v. United Consumers Club*, 499 N.E.2d 792 (Ind. Ct. App. 1986)—the only published case where an Indiana court applied an exception to the rule precluding money-based conversion claims. In *Midland-Guardian*, the Court of Appeals affirmed a finding of criminal conversion because Midland Guardian's retention of funds after installment contracts were collected or charged off was unauthorized. *Id.* at 797. Accordingly, Stafford-Smith argues that Schut was entrusted to negotiate with equipment vendors on behalf of Stafford-Smith and his delegated authority did not include diverting company funds for his own benefit.

However, Stafford-Smith largely avoids discussing the long line of distinguishing cases after *Midland-Guardian*, which note the unique situation that the funds in that case were not mingled with any of Midland-Guardian's funds, and the account was entrusted to Midland-Guardian to be separately held and particularly accounted for. *See, e.g., Bowden*, 2 N.E.3d at 751; *Excel Indus., Inc. v. Signal Capital Corp.*, 574 N.E.2d 946, 948 (Ind. Ct. App. 1991); *Manthey Estate ex rel. Manthey v. Kruse, Inc.*, No. 1:10-cv-51, 2011 WL 5101802 (N.D. Ind. Oct. 27, 2011).

---

[2] Here, the Court also found something wrong—"In the Court's judgment, based on the proofs, [the $4,194.70 payment] was unauthorized. I'm satisfied that there was no authority for that. The explanations that I've had from [Schut] on that . . . are not believable, and certainly he surreptitiously hid this [payment]."
However, Stafford-Smith inexplicably pursued the conversion claim to the apparent exclusion of other claims, such as one for a breach of fiduciary duty. Those claims would have probably presented closer calls, in the Court's view. At the close of proofs, Stafford-Smith's counsel even noted: "Adam is the person who negotiates th[e] discounts. He is the person who has a *fiduciary duty* to Stafford-Smith to make sure that the price is the lowest possible. If he is taking five percent out of the job personally, there is no way that he is fulfilling his *loyalty* and *duty of responsibility* to Stafford-Smith." Even true, Schut's behavior does not constitute a tort for conversion under Indiana law.

As in those cases, "*Midland* is not on par with the facts of the case at hand." *Bowden*, 2 N.E.3d at 752.

Here, "no specific, identifiable funds were entrusted to [Schut] to be held in a separate account for [Stafford-Smith]." *Id.* The vendor, not Stafford-Smith, gave Schut the $4,194.70 payment. Stafford-Smith gave the vendor, not Schut, the money for the equipment. Neither Stafford-Smith nor Schut established a separate account for the purpose of depositing spiffs, ordinary or otherwise, which remain fairly common in the industry. And company policy did not unambiguously prohibit ordinary spiffs. While this particular transaction was unauthorized by company policy, and Stafford-Smith did not demonstrate good faith, Stafford-Smith did not have a policy that clearly required Schut to return any spiff, ordinary or otherwise.

No evidence was presented that Stafford-Smith paid Thermalrite for the walk-in cooler from any source other than Stafford-Smith's general checking account. There is no evidence the money Thermalrite paid to 2 Market Group came from any source other than Thermalrite's general checking account. And there is no evidence that the spiff itself went into any source other than directly to Schut, who deposited the check in his general checking account. At no point in any of these transactions was money placed in a segregated account.

Stafford-Smith notes it had no idea that Schut received the Thermalrite spiff, but that fact works against Stafford-Smith. Stafford-Smith, in other words, had no expectation of receiving any particular payment "with which [Schut] was entrusted to apply to a certain purpose," nor was Stafford-Smith even aware of a "determinate sum." *Butler*, 639 N.E.2d at 667. A generalized duty to "negotiate the best price" does not suffice to establish that "the defendant was entrusted to apply [*a determinate sum*] to a *certain purpose*" under Indiana law for a conversion. *Id.*

6

Even if Stafford-Smith could establish a general entitlement or property interest in the spiffs, it had not established an interest in the specific spiffs in this case. In fact, it appears that under Indiana law, if Stafford-Smith wanted to claim ownership in all spiffs given to employees directly by third parties, it would have to take several concrete steps to do so. Stafford-Smith did not do so. In fact, Stafford-Smith's policies and handbook did not unambiguously prohibit spiffs—which were given to other employees, as well—despite the prevalence of spiffs in the industry. And even if the policies had—the receipt of a payment directly from a third-party would not necessarily constitute a civil (or criminal) tort for *conversion*. *See Bowden*, 2 N.E.3d at 751–52.

Even if the Court assumes that Stafford-Smith, as it contends, has established that Schut violated a duty as an agent,[3] that conclusion does not establish that Stafford-Smith had property rights in the particular spiffs as "special chattel." At best, that conclusion would establish a creditor-debtor obligation. Agency law does not establish the *nature* of the property. *See* 3 Am. Jur. 2d *Agency* § 204 (2014) ("Profits made and advantages gained in the execution of agency, beyond the agent's agreed compensation, belong to the principal unless the parties themselves have otherwise agreed. An agent must account to the principal for any secret profit received and must disgorge and ill-gotten gains.").

Stafford-Smith also argues that a check may be subject of a claim for conversion, citing Ind. Code. § 26-1-3.1-420(a), and quoting," [t]he law applicable to conversion of personal property applies to instruments." However, the statute limits claims for conversion of an instrument to "(1) the issuer or acceptor of the instrument; or (2) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee." *Id*. Further, the statute explicitly limits liability to the amount payable on the instrument and also limits recovery to the

---

[3] In fact, Schut was an *employee*, and not an *agent* as a matter of fact and law. *See* Williston on Contracts § 54:14 (4th ed. 2016).

claimaint's interest in the instrument, "[n]otwithstanding IC 34-24-3-1 or any other statute providing a measure of damages for conversion[.]" Ind. Code. § 25-1-3.1-420(b).

Stafford-Smith's negotiable instrument theory poses several problems. Initially, a notice issue arises. The pleading for the conversion claim gives notice to a claim arising from a violation of Stafford-Smith's policies and the tort of conversion. The pleading likely does not give notice to a statutory claim for conversion arising under Indiana's commercial code.

Further, Stafford-Smith has presented no evidence that the check at issue was a rebate payable to Stafford-Smith, as opposed to a spiff. Although it was not an "ordinary spiff," the evidence does not establish Stafford-Smith's entitlement to the check as a rebate. As the claimant, Stafford-Smith bears the burden of establishing its ownership of the *specific* funds. If the check was not a rebate owed to Stafford-Smith, but was a spiff, Stafford-Smith has no ownership interest in the check itself. Stafford-Smith was not the issuer, the acceptor, the payee, or the endorsee. Neither was Stafford-Smith the rightful owner of the check as the *intended* beneficiary.[4]

If the result here seems normatively harsh and perhaps unjust, Stafford-Smith can only blame itself. Stafford-Smith did not have an unambiguous policy prohibiting spiffs, despite the prevalence of spiffs in the industry; it did not contractually obligate its employees to return spiffs; it did not contractually obligate any contracting companies to pay spiffs to Stafford-Smith (or prohibit spiffs from accompanying any transaction); it did not establish separate accounts for spiffs; it did not pursue any more applicable claims, *see supra* note 2, and instead insisted on pounding "square [facts] in a round [tort]." *Cf. Kopis*, 489 N.E.2d at 1270 (noting an exception to

---

[4] Stafford-Smith presented no evidence to suggest the third parties intended the spiffs to be paid to Stafford-Smith. On the contrary. Stafford-Smith's citations to cases involving the law of other states is inapposite. Stafford-Smith has not made a claim as an accommodated party, as the facts in those cases indicate. *See Client's Sec. Fund v. Goldome*, 148 Misc.2d 157 (N.Y. Sup. Ct. 1990); *Tubin v. Rabin*, 389 F. Supp. 787 (N.D. Tex. 1974).

the general rule—"money may be the subject of an action for conversion[,]" but "the money must be capable of being identified as a special chattel").

Schut did not act in good faith with the $4,194.70 payment, and he put personal profit ahead of business ethics.[5] *See supra* note 2. However one categorizes Schut's behavior, it did not constitute a tort for conversion under Indiana law.

## ORDER

For the reasons contained in the accompanying Opinion, the Court finds Stafford-Smith has not established by a preponderance of the evidence the elements for a tort of conversion. Judgment will enter separately.

**IT IS SO ORDERED**.

Date:   August 9, 2016            /s/ Paul L. Maloney
                                  Paul L. Maloney
                                  United States District Judge

---

[5] Consequently, a motion for an award for costs may be disfavored. *See, e.g., Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471, 483 (5th Cir. 2006) ("A district court has wide discretion whether to award costs to the prevailing party.").